CLERK'S OFFICE U.S. DIST. COURT.
AT ROANOKE, VA
FILED

JAN 24 2017

JULIA C. DUDLEY, CLERK
BY: 
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

JOYCE WERTMAN,                    )
                                  )
    Plaintiff,                    )
                                  )
v.                                )     Civil Action No. 7:15-cv-00466
                                  )
UNITED STATES OF AMERICA,         )     By:    Michael F. Urbanski
                                  )     United States District Judge
    Defendant.                    )

## MEMORANDUM OPINION

Plaintiff Joyce Wertman, Administrator of the Estate of William James Lovell, brought this action for wrongful death against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et. seq. and 28 U.S.C. § 1346(b)(1). Wertman alleges that actions taken by Dr. Arindham Choudhury and Dr. Paris Butler on January 30, 2012, while performing a cholecystectomy at the Salem VA Medical Center, amount to medical malpractice that caused William Lovell's death on February 18, 2012.

The court held a bench trial on October 24-25, 2016. Based on the findings of fact and conclusions of law that follow, the court **GRANTS** judgment to the plaintiff in the amount of $793,423.78.

## FINDINGS OF FACT

### Lovell's Treatment History

1.  On December 8, 2011, William James Lovell, a 65-year old veteran, arrived at the Salem VA Medical Center in Salem, Virginia, complaining of symptoms associated with acute cholecystitis (inflammation of the gallbladder). Trial Tr. Vol. 1, Oct. 24, 2016, ECF

No. 69, 27:9-16.[1] According to Dr. Choudhury, Lovell's treating physician at the Salem VA, Lovell "was having right upper-quadrant pain and inability to eat for several months prior to his presentation." Trial Tr. Vol. 2, Oct. 25, 2016, ECF No. 70, 14:14-16. Dr. Choudhury determined that Lovell suffered from cholangitis, an infection of the liver's bile ducts, and likely chronic cholecystitis, meaning he had longstanding issues with infection and gallstones in his gallbladder. Trial Tr. Vol. 2, 13:23–14:8. As a result of this diagnosis, Lovell travelled to the Hunter Holmes McGuire VA Medical Center in Richmond, Virginia for an endoscopic retrograde cholangiopancreatography ("ERCP") to drain his bile ducts. Trial Tr. Vol. 2, 14:17-21, 15:10-17.

2.  On December 12, 2011, doctors at the Hunter Holmes McGuire VA Medical Center performed the ERCP on Lovell to alleviate infection and associated symptoms of stones in the biliary tract. ERCP Report, ECF No. 59-2, at 1. As explained by Dr. Choudhury:

> ERCP stands for endoscopic retrograde cholangiopancreatography, which is basically, in simple terms, someone puts an endoscope down into the duodenal area, which is the second portion of the duodenum; they put a plastic tube that they can put dye into and they backfill, so you can actually look at the what the biliary—the word "biliary tree" is used commonly in our understanding, but it's the bile ducts. So you can see a road map of the bile ducts.

Trial Tr. Vol. 2, 15:10-17. During the procedure in Richmond, the doctors performed a stone removal and placed a stent in the biliary tract. ERCP Report at 1.

3.  Following the ERCP, Dr. Choudhury scheduled a laparoscopic cholecystectomy to remove Lovell's gallbladder at the Salem VA on January 30, 2012. Trial Tr. Vol. 2, 17:6-10.

---

[1] The page numbers of the trial transcript referenced herein reflect the ECF number at the lower right hand corner of the transcript pages.

The laparoscopic procedure allows for an easier recovery than an open cholecystectomy. Id. Generally, such gallbladder removal surgeries are scheduled six to eight weeks after an ERCP. Trial Tr. Vol. 2, 16:10-12. This allows "the inflammatory process to resolve … before proceeding with cholecystectomy." Report Letter from Dr. William Kelley, Richmond Surgical, re: William Lovell (June 2, 2016), ECF No. 62–5, at 1.

4. On January 30, 2012, Dr. Butler, a supervised resident, and Dr. Choudhury, acting as the attending physician, performed the cholecystectomy on Lovell. Trial Tr. Vol. 2, 18:17–19:2. However, during the surgery, Drs. Choudhury and Butler encountered complications that hindered their ability to access and view the gallbladder. Trial Tr. Vol. 2, 21:1-20. As a result, Dr. Choudhury decided to convert the procedure from a laparoscopic cholecystectomy to an open cholecystectomy. Trial Tr. Vol. 2, 22:5-12. The open procedure allowed Drs. Choudhury and Butler more direct visualization and control over the area on which they were operating. Trial Tr. Vol. 2, 21:21-24.

5. After converting the procedure to an open cholecystectomy, Drs. Choudhury and Butler encountered further complications. There was a small tear in Lovell's right hepatic flexure of the colon (large bowel), which the doctors repaired through stitching. Trial Tr. Vol. 2, 23:6-22. The doctors also recognized that the gallbladder was extremely scarred and densely adherent. Trial Tr. Vol. 2, 22:23–23:5. Dr. Choudhury then determined that continuing to cut, in an effort to remove the entire gallbladder, was too dangerous. Trial Tr. Vol. 2, 24:7-15. He therefore converted the procedure to a subtotal cholecystectomy. Trial Tr. Vol. 2, 24:16-19. A subtotal cholecystectomy involves taking out only a part of the gallbladder, in this case, the part that was visible, in lieu of the whole gallbladder. Id.

3

6. Upon deciding to convert the procedure to a subtotal cholecystectomy, Drs. Choudhury and Butler transected, or cut, the gallbladder open. Trial Tr. Vol. 2, 24:22. Dr. Choudhury believed he removed four centimeters of Lovell's gallbladder, which was at most half of the organ. Trial Tr. Vol. 2, 25:16-17. Prior to closing Lovell's incision, the doctors washed the area and took efforts to assure no bile leaks were present. Trial Tr. Vol. 2, 26:4-17. At the time of the surgery, Dr. Choudhury believed that neither he nor Dr. Butler transected the common bile duct (a part of the gastrointestinal tract) or the jejunum (a part of the small bowel). Trial Tr. Vol. 2, 26:20–27:23.

7. Following the subtotal cholecystectomy procedure, Lovell was discharged from the Salem VA on February 1, 2012. Trial Tr. Vol. 2, 39:19-20. The medical records reflect that Lovell was doing well postoperatively, that he was able to eat regular food, and that he reported low levels of pain. Trial Tr. Vol. 2, 39:23–40:6.

8. On February 4, 2012, Lovell went to the Emergency Room at Wythe County Community Hospital ("WCCH") suffering from urinary retention. WCCH Records (Feb. 4, 2012), ECF No. 59-5, at 4. He was accompanied by Joyce Wertman, the plaintiff in this suit. Lovell received a Foley catheter and was discharged. WCCH Records at 11-12. Although the hospital records reflect that Lovell's pain level was zero after insertion of the catheter, see WCCH Records at 8, 12, Wertman testified that, despite the catheter, Lovell was unable to urinate and remained in a great deal of pain after being discharged.

9. Reporting "severe abdominal pain," Lovell returned to WCCH in the early morning hours of February 5, 2012. Trial Tr. Vol. 1, 64:21. He underwent a CT scan that revealed "what appeared to be a perforation of the intestine with free fluid and gas in the abdominal

4

cavity." Trial Tr. Vol. 1, 64:20-23. Lovell was then transferred to Carilion Roanoke Memorial Hospital ("CRMH") for surgery. Trial Tr. Vol. 1, 64:23-25; CRMH Laparotomy Summary, ECF No. 59–6.

10.   Dr. Jesse Davidson, Lovell's attending physician at CRMH, performed an emergency surgery in Lovell's abdomen consisting of an exploratory laparotomy and repairs to perforation of the small intestine. CRMH Laparotomy Summary at 1. Upon entering the abdomen, Dr. Davidson discovered a large quantity, approximately three liters, of bilious fluid. Trial Tr. Vol. 2, 81:1-3. Although Dr. Davidson testified that the bile could have been in Lovell's abdominal cavity for as little as eight hours, Trial Tr. Vol. 2, 82:9, the "death summary" he dictated stated "that the bile had been present in the peritoneal cavity for several days." Trial Tr. Vol. 2, 88:21-23. As to the conclusion in the death summary that the fluid had been in Lovell's abdomen for several days, Dr. Davidson explained he "just felt like off the top of my head that that's what it probably had been." Trial Tr. Vol. 2, 89:9-10. In any event, the bile was "consistent with enteric perforation," meaning that "there was a hole in the bowel and that the contents had leaked into the abdomen and caused an inflammatory reaction." Trial Tr. Vol. 2, 81:19, 81:21-23. After Dr. Davidson suctioned and cleaned this fluid he found a hole in Lovell's jejunum, a part of the small bowel. Trial Tr. Vol. 2, 81:4-13; CRMH Laparotomy Summary at 2. Dr. Davidson repaired the hole with sutures and proceeded to inspect the remainder of the abdomen. Id. The only additional abnormality Dr. Davidson could find was an inflammatory reaction where Lovell previously had gallbladder surgery. Trial Tr. Vol. 2, 81:8-10. Finally, Dr. Davidson left two drains in Lovell, one in his

5

right upper abdomen and the other in his right lower abdomen, and then closed Lovell's incision. Trial Tr. Vol. 2, 81:11-13.

11. Despite the emergency laparotomy, Lovell did not recover. He developed a number of problems including acute renal failure, which required insertion of a catheter and continuous replacement renal therapy. CRMH Discharge Notes, Feb. 27, 2012, ECF No. 62-3, at 2. He also developed ongoing "systemic inflammatory response syndrome or reaction syndrome" or SIRS. Trial Tr. Vol. 2, 102:17-18. According to Dr. Davidson, SIRS "basically means your body has developed intense inflammatory changes throughout the system in the bloodstream, in the lungs, [and in] the kidneys due to some sort of ongoing infection or chemical problem." Trial Tr. Vol. 2, 102:19-22. Dr. Davidson determined that Lovell's SIRS was the result of bile leaking into his abdomen. Trial Tr. Vol. 2, 103:21-24. Lovell also developed respiratory failure and required a tracheostomy, which Dr. Davidson performed on February 14, 2012. Trial Tr. Vol. 2, 105:13-17.

12. On February 14, 2012, Dr. Paul Yeaton at CRMH performed another ERCP—endoscopic retrograde cholangiopancreatography—in an effort to stop the bile leak. CRMH ERCP Notes, ECF No. 62-7. After the procedure, Dr. Yeaton confirmed a "[h]igh grade bile leak consistent with transection of the common hepatic duct." CRMH ERCP Notes at 2. The ERCP, however, failed to stop the bile leak. Trial Tr. Vol. 2, 109:4-5. Therefore, Dr. Yeaton recommended a percutaneous hepatic cholangiogram ("PTC"), another procedure that could have stopped the bile leak. Trial Tr. Vol. 2, 108:18-22.

13. Dr. Thomas Bishop, also a CRMH physician, performed the PTC on February 15, 2012. CRMH PTC Notes, ECF No. 62-8. According to Dr. Davidson, Dr. Bishop was trying

6

to "access a bile duct through which he could place a guide wire hopefully through the area that was transected, and then over the guide wire place a stent to stop the leakage." Trial Tr. Vol. 2, 108:18-22. Although Lovell did not experience complications from the PTC, the procedure was not successful in resolving the bile leak. CRMH PTC Notes at 2. However, Dr. Bishop was able to image Lovell's biliary system; his report notes: "The common bile duct appears to be transected just below the bifurcation of the left and right intrahepatic ducts, however additional cholangiography may be required to more clearly delineate the anatomy." Id.

14. By February 15, 2012, it was clear to Dr. Davidson that the source of the infection, or sepsis, was the leaking bile duct. Trial Tr. Vol. 2, 111:21-23. On February 16, 2012, Dr. Davidson spoke with Dr. Yeaton and Dr. Bishop, who were going to make a third attempt "to try endoscopically [to] reconstruct [the] bile ducts." CRMH Records, ECF No. 62-7, at 65. This attempt to stop bile leakage, however, was also unsuccessful. Trial Tr. Vol. 2, 112:16-17.

15. On February 17, 2012, CRMH surgeon Dr. John Wessinger performed a cholangiogram on Lovell in yet another attempt to stop the flow of bile. Trial Tr. Vol. 2, 113:8-16; CRMH Records at 49. As Dr. Davidson testified, Dr. Wessinger "was able to place a drain across that transection, the hope being that that would then drain the bile contents from the area of transection into the normal flow pattern into the bowel." Trial Tr. Vol. 2, 113:18-21. Lovell, however, did not improve.

16. By the morning of February 18, 2012, Lovell was critically ill. CRMH Records at 47. Dr. Robert Keely, a CRMH physician, noted: "Persistent decline despite all efforts. [Patient]

examined, chart reviewed, discussed with wife. I think that he will succumb to his problems in the next 12-24 hr ... Will continue all care otherwise." CRMH Records at 43. A short time later, at 1:15 PM, Lovell died. CRMH Records at 42. The "Discharge Summaries" prepared by Dr. Davidson listed the factors that led to Lovell's death: (1) multi-system organ failure; (2) small bowel perforation; and (3) transection of the common bile duct with biliary peritonitis. CRMH Discharge Notes at 1.

### Standard of Care

The applicable standard of care and whether Drs. Choudhury and Butler breached that standard in treating Lovell were central issues at trial. Both plaintiff and defendant presented to the court expert testimony on these questions. The evidence presented by plaintiff as to the standard of care issue took the form of expert testimony by Dr. Aaron Chevinsky. Defendant presented the expert testimony of Dr. Choudhury and Dr. William Kelley.

17. The court admitted Dr. Chevinsky as an expert witness as to standard of care and causation "with regard to general surgery, particularly with regard to gallbladder surgery, and with regard to postoperative care of folks who suffer from some complications or issues related to gallbladder surgery." Trial Tr. Vol. 1, 22:14-19. Dr. Chevinsky has over 25 years of experience as a medical doctor, is a board certified general surgeon, and has conducted numerous laparoscopic and open gallbladder removal surgeries.

18. Dr. Chevinsky testified that converting Lovell's procedure from a laparoscopic cholecystectomy to an open cholecystectomy "was a perfectly appropriate decision for that

surgeon to make." Trial Tr. Vol. 1, 37:6-7. However, to meet the standard of care during an open cholecystectomy, Dr. Chevinsky testified:

> You need to conclusively identify the structures you are cutting before you cut them, otherwise you shouldn't cut them. And that can manifest in a number of ways, either by direct visual identification, identification by using what is called a cholangiogram. And anything that says "gram" means it's an x-ray. And "cholangio" means bile duct ... [B]efore making any cut to or dividing any structure, you need to identify the duct and the artery, the cystic duct and the cystic artery. You have to know also where the common bile duct resides.

Trial Tr. Vol. 1, 39:12-18, 40:13-16. Dr. Chevinsky testified that these steps are important given that "the lower part of the gallbladder can be sitting right on top of the duct, as [he] believe[d] happened in this case." Trial Tr. Vol. 1, 40:3-5. In other words, a doctor risks cutting the wrong tissue without first identifying the bile duct and other structures.

19. Based on his review of Lovell's medical records, Dr. Chevinsky concluded that Drs. Choudhury and Butler violated the standard of care because they cut the gallbladder without positively identifying the surrounding structures. Trial Tr. Vol. 1, 55:22. Dr. Chevinsky acknowledged "that there are mitigating factors that might make [identifying the structures] difficult," such as the thickening of the gallbladder, which may have prevented a successful cholangiogram. Trial Tr. Vol. 1, 56:8-12. Nevertheless, Dr. Chevinsky's testimony indicates that Drs. Choudhury and Butler's failure to attempt a cholangiogram or an alternate method of identifying the surrounding structures amounted to a breach of the standard of care. Trial Tr. Vol. 1, 57:22–58:18.

9

20. Dr. Chevinsky also testified that the injury to Lovell's small bowel occurred sometime during the cholecystectomy performed by Drs. Choudhury and Butler. Trial Tr. Vol. 1, 73:11. Because Drs. Choudhury and Butler recognized and fixed an injury to Lovell's large bowel during the procedure, see Findings of Fact, supra ¶ 5, "under the standard of care, when you've already had one bowel injury, prior to closing you should look at the rest of the bowel, at least to the extent that you can." Trial Tr. Vol. 1, 77:5-8. This standard, moreover, applied whether the small bowel injury was initially a full-thickness or a partial-thickness injury, which was a matter of contention at trial. Trial Tr. Vol. 1, 77:1-5. Although Dr. Chevinsky believed it was a full-thickness perforation at the outset, he could not say "with absolute certainty that this was a full-thickness perforation at the surgery that Dr. Choudhury did, or a partial-thickness injury which became full-thickness over the next several days." Trial Tr. Vol. 1, 141:12-19.

21. At trial, Dr. Choudhury served both as a fact witness as Lovell's surgeon at the Salem VA and as an expert witness with respect to gallbladder surgery. See Trial Tr. Vol. 2, 12:1-11 (qualifying Dr. Choudhury as an expert witness).

22. When asked by defense counsel whether it would be "a breach in the standard of care not to be able to detect a bile leak intraoperatively," Dr. Choudhury testified that he did not think it would. Trial Tr. Vol. 2, 38:21–39:6. Dr. Choudhury elaborated:

> [I]t certainly would be a breach in the standard of care to be bullheaded and start operating in an area that is very scarred in, because you could do a lot more damage to the common duct, to the point that no one could repair it. And I think that's what we were afraid of and that's why we didn't go down that far.

10

Trial Tr. Vol. 2, 39:6-11. Although Dr. Choudhury agreed that performing a cholangiogram would be the standard of care if it could be done safely, Trial Tr. Vol. 2, 50:20-23, he did not believe that one could be done safely in this case:

> Q    Now, Dr. Choudhury, did you perform an intraoperative cholangiogram during this procedure at all?
>
> A    No. I thought it was kind of dangerous to do that. We could not – [the gallbladder] was so scarred in that it, I think, number one, it would have -- we couldn't see where the ducts were for us to put any kind of tubes in. Okay. Number two, the person already had a stent in place. I mean, you can always put dye in through that stent and get an idea of what the biliary tree was like … [but the Salem VA] didn't have that capability.

Trial Tr. Vol. 2, 31:4-12, 31:22-23. Dr. Choudhury did not opt to inject Lovell with dye because that would have required abandoning the procedure and sending him to another facility, Trial Tr. Vol. 2, 31:24–32:3, which, Dr. Choudhury believed, would have been riskier than continuing with the subtotal cholecystectomy, as they did. Trial Tr. Vol. 2, 50:13-23.

23.   Dr. Choudhury also disagreed with Dr. Chevinsky as to the standard of care regarding Lovell's small bowel perforation:

> Q    Now, Dr. Choudhury, in the performance of a cholecystectomy procedure, is it the standard of care, based on your training and experience, to run the entire bowel?
>
> A    No.
>
> Q    Why not?
>
> A    Well, you're in—as His Honor just asked, you're in a very small area. You're talking—well, now, take it back. If the colon—like we did, we did look around those areas. But if we suspect no injuries to those areas, then trying to take out 22 feet of bowel to look at it through that hole up in the right upper quadrant is, at least in my training and what I have trained here in the last 26 years, we haven't consistently run the bowel, unless we have a suspicion of an injury of the small bowel itself. And we

11

would know that from our initial visualization, when we
went in with the scope.

Trial Tr. Vol. 2, 33:5-19. Dr. Choudhury had "no idea" how an injury to Lovell's jejunum

could have occurred. Trial Tr. Vol. 2, 29:10. Dr. Choudhury did not believe it was a full-

thickness injury because, if it was, he and Dr. Butler would have detected it. Trial Tr. Vol. 2,

29:12-13. Even if it was a partial-thickness injury, Dr. Choudhury testified that it would not

be a breach of the standard of care for a doctor to not detect such an injury intraoperatively.

Trial Tr. Vol. 2, 36:4-8. Dr. Choudhury further testified that, upon noticing and repairing the

large bowel injury, the standard of care did not require them to examine the small bowel,

"because the small bowel was not anywhere within [their] dissection area." Trial Tr. Vol. 2,

37:2-3.

   24.  Dr. William Kelley also testified as an expert witness for defendant. Dr. Kelley was

duly qualified as an expert and received as "an expert in the field of general surgery,

including gallbladders, as both the standard of care and causation" without objection. Trial

Tr. Vol. 2, 124:4-10.

   25.  As for Lovell's small bowel injury, Dr. Kelley disagreed with Dr. Chevinsky on

whether the standard of care required Drs. Choudhury and Butler to examine the bowel:

> Q     Is it a breach of the standard of care for a surgeon to fail
>        to recognize a partial-thickness injury intraoperatively?
> A     No. It's quite typical.

Trial Tr. Vol. 2, 148:9-11. Furthermore, unlike Dr. Chevinsky, Dr. Kelley adamantly believed

that at the time of the gallbladder surgery there was no full-thickness injury in Lovell's small

bowel. Trial Tr. Vol. 2, 149:3-6.

26. With regard to the bile duct, Dr. Kelley, reading from his own written expert's report, testified:

> The standard procedure at this point would be to perform an x-ray study of the bile duct ... The standard procedure is a good principle to follow but cannot possibly allow for all mitigating factors that a surgeon might encounter.

Trial Tr. Vol. 2, 137:3-4, 138:3-5. Dr. Kelley further elaborated:

> The general principle is that an intraoperative cholangiogram is performed in a difficult situation. However, the surgeon has to be allowed to make the judgment about the risks and benefits of anything he does at the time of surgery ... If the risk exceeds the likelihood of being able to complete the cholangiogram, then a prudent surgeon would not proceed with the cholangiogram study.

Trial Tr. Vol. 2, 138:21-24, 139:7-9. Thus, Dr. Kelley agreed with Dr. Chevinsky that the applicable standard of care typically would have required Drs. Choudhury and Butler to perform a cholangiogram before continuing with the cholecystectomy. Nevertheless, Dr. Kelley opined that, in this situation, mitigating factors permitted the Salem VA surgeons to not perform an intraoperative cholangiogram. Trial Tr. Vol. 2, 139:20-24. These factors were, first, that a cholangiogram had been performed on Lovell in December (although, he acknowledged, this would not be identical to one performed close to or during the January 30 surgery), and, second, that "there was no way to get the contrast safely into the bile duct." Trial Tr. Vol. 2, 161:2-8. While the standard of care, according to Dr. Kelley, did not require Drs. Choudhury and Butler to conduct a cholangiogram, Dr. Kelley testified the standard of care would have required the Salem VA doctors to consider such a procedure. Trial Tr. Vol. 2, 155:12. In Dr. Kelley's own words, the "usual course of action" is to try to perform an intraoperative cholangiogram. Trial Tr. Vol. 2, 165:20-22.

13

27.   The expert witnesses presented by plaintiff and defendant disagreed whether the standard of care required Drs. Choudhury and Butler to perform an intraoperative cholangiogram under the circumstances facing them given the condition of Lovell's gallbladder. Thus, Dr. Kelley testified that the VA surgeons, facing the difficult situation of Lovell's occluded gallbladder, took the safest course available to remove a portion of the gallbladder by means of a subtotal cholecystectomy. Trial Tr. Vol. 2, 166:1–67:3.

28.   While defense expert Dr. Kelley did not fault the VA surgeons for making the intraoperative judgment to remove what part of the gallbladder they could via the subtotal cholecystectomy, Dr. Kelley could not agree that cutting the bile duct during the procedure was consistent with the standard of care. Dr. Kelley testified as follows:

> Q   And even though you've never performed a subtotal, I take it the standard of care for a subtotal cholecystectomy would mean that you don't cut too far down the gallbladder, right?
>
> A   Right. That was the -- that was the intent of the surgeon, to not get down there.

Trial Tr. Vol. 2, 196:11-15. In other words, according to Dr. Kelley, cutting "too far down the gallbladder" and hitting the common bile duct would be a breach of the standard of care. Importantly, Dr. Kelley previously determined that "the bile duct was indeed injured during the surgery at the Salem VA Hospital." Trial Tr. Vol. 2, 142:4-5.

29.   After a thorough review of this evidence, the court finds that the VA surgeons did not conform to the applicable standard of care in treating Lovell. Dr. Chevinsky (testifying for plaintiff) and Dr. Kelley (testifying for defendant) agreed that a surgeon performing a subtotal cholecystectomy would normally be required to perform an intraoperative cholangiogram, or otherwise identify the nearby critical structures, before transecting the

14

gallbladder. Dr. Chevinsky characterized this as the standard of care and testified that the purpose of identifying the critical structures is to avoid injury to those structures, especially the common bile duct. Trial Tr. Vol. 1, 49:5-16. Dr. Kelley added the caveat that while an intraoperative cholangiogram should be considered, the condition of the gallbladder may counsel against it. Regardless, Dr. Kelley testified that the standard of care required the surgeons not to cut too far down the gallbladder and sever the common bile duct while performing a subtotal cholecystectomy. Trial Tr. Vol. 2, 196:11-15. Both Drs. Chevinsky and Kelley concluded that the Salem VA surgeons severed the common bile duct during the January 30 operation. See Trial Tr. Vol. 1, 60:9-11 (Dr. Chevinsky); Trial Tr. Vol. 2, 142:4-5 (Dr. Kelley).[2] The court agrees with this conclusion, and therefore determines that the VA surgeons breached the standard of care.

## Causation

Another central issue at trial was whether the actions of the Salem VA surgeons, Drs. Choudhury and Butler, proximately caused Lovell's death several days later. Both plaintiff and defendant presented expert testimony on this issue to the court. Dr. Chevinsky, as plaintiff's only expert witness, testified as to causation. Defendant likewise presented Dr. Kelley's expert testimony on causation.[3]

---

[2] For his part, Dr. Choudhury was less than certain as to whether he or Dr. Butler injured the common bile duct during the procedure: "I can only say that we did not see any bile come out … so, no, I don't believe I felt like I even went down that far." Trial Tr. Vol. 2, 27:14-18. The court reaches a contrary conclusion and finds that the injury to the common bile duct did, in fact, occur during the January 30 operation. See Trial Tr. Vol. 2, 142:8-13 (Dr. Kelley testifying, "there was no other explanation that I could induce, given the fact that there was no surgery done between the Salem operation and Dr. Davidson's operation … and we know that, from subsequent ERCPs, there was a transection of the bile duct.").

[3] Though admitted as an expert on standard of care, Dr. Choudhury was not admitted as an expert on causation.

30.   Based on his review of the medical records, Dr. Chevinsky determined "that there was an iatrogenic injury to the bile duct caused at the time of the initial cholecystectomy. 'Iatrogenic' meaning by the doctor.'" Trial Tr. Vol. 1, 60:10-12. Dr. Chevinsky believed the bile leak, caused by Drs. Choudhury and Butler, resulted in Lovell's complications in the days following his subtotal cholecystectomy. Trial Tr. Vol. 1, 100:2-4. Dr. Chevinsky then drew a link between those complications and Lovell's ultimate demise:

> Q      Now, I'll go back to my question: Do you have an opinion whether the bile leak, ongoing as it was until at least the 17th, was a proximate cause of his death?
> A      Yes.
> Q      What is that opinion?
> A      That it was, in fact, the proximate cause of his death.
> Q      What are your bases for concluding that?
> A      Well, he had two sources of infection. One was controlled initially, one was not controlled or recognized for several days. At that point, he had well-established sepsis, which was irreversible.

Trial Tr. Vol. 1, 105:2-12.

31.   Dr. Chevinsky's expert opinion on causation comports with the findings of Dr. Jesse Davidson, Lovell's attending physician at CRMH. Although not admitted as an expert witness on the issue of causation, Dr. Davidson was called by defendant and testified as to his treatment and diagnosis of Lovell. Trial Tr. Vol. 2, 104:15-17. Dr. Davidson concluded that Lovell's health would have improved if not for the bile leak. Trial Tr. Vol. 2, 105:8-12. Moreover, Dr. Davidson linked the bile leak to a transection of Lovell's common bile duct:

> Q      And included in the cause of death, you listed, "Transection of the common bile duct with biliary peritonitis," correct?
> A      Yes.
> Q      And based upon the questions I've asked you in regards to the causes of death you listed in the discharge

> diagnosis, was it your diagnosis that the bile leak
> transection was a proximate cause of his death?
>
> A    Yes.
>
> Q    And you make that diagnosis to a reasonable degree of
> medical certainty?
>
> A    Yes.

Trial Tr. Vol. 2, 115:15–16:1. However, Dr. Davidson had not reviewed Lovell's progress

notes from the Salem VA procedure and could not determine how Lovell's bile duct was

transected. Trial Tr. Vol. 2, 116:8-20.

    32.    Dr. Chevinsky also opined that the perforation of Lovell's small bowel (the jejunum)

occurred "at the time of the initial surgery." Trial Tr. Vol. 1, 73:11. When asked by plaintiff's

counsel whether "anything in [Dr. Davidson's death summary] description of the condition

of the small bowel … would lead you to believe there could be another cause," Dr.

Chevinsky answered, "No." Trial Tr. Vol. 1, 73:12-15. Although the jejunum is typically

eight to ten inches away from where Drs. Choudhury and Butler cut into Lovell, Dr.

Chevinsky explained that "the jejunum is mobile" and has the ability of moving "right up to

the gallbladder." Trial Tr. Vol. 1, 74:2-5. Dr. Chevinsky could not testify with certainty as to

the exact mechanism by which the surgeons injured the small bowel, Trial Tr. Vol. 1, 75:16-

18, nor could he state conclusively whether the injury was initially full- or partial-thickness,

Trial Tr. Vol. 1, 141:12-19. Nevertheless, Dr. Chevinsky's testimony was clear: "If not for

that surgery, [Lovell] wouldn't have had a bowel perforation." Trial Tr. Vol. 1, 80:20-21.

    33.    Dr. Chevinsky concluded that "that the ultimate cause of [Lovell's] demise was the

unresolved infection from the bile duct compromised by the perforation of the intestine."

Trial Tr. Vol. 1, 86:22-24. In that regard, Dr. Chevinsky noted that "somebody with an

intestinal injury, in whom you repair the injury, more likely than not is going to survive and go on to recover if that's the only injury." Trial Tr. Vol. 1, 87:19-21.

34. Defendant's expert witness, Dr. Kelley, agreed that Lovell's bile duct was injured during the subtotal cholecystectomy at the Salem VA. Trial Tr. Vol. 2, 142:4-5. He testified: "[T]here was no other explanation that I could induce, given the fact that there was no surgery done between the Salem operation and Dr. Davidson's operation; and there was a lot of bilious fluid in there; and we know that, from the subsequent ERCPs, there was a transection of the bile duct." Trial Tr. Vol. 2, 142:8-13. However, Dr. Kelley opined that the sepsis which Lovell ultimately died from was not caused by his bile duct injury. Trial Tr. Vol. 2, 151:20-23. Rather, he believed the sepsis "was caused when the occult partial-thickness small bowel injury became full-thickness—full-thickness delayed perforation six days postop." Id. Dr. Kelley rendered this testimony to a "reasonable degree of medical probability." Trial Tr. Vol. 2, 152:1-3.

35. The court finds that an injury to Lovell's common bile duct occurred sometime during the January 30 surgery and that this injury proximately caused Lovell's eventual death. This finding is consistent with Dr. Chevinsky's expert opinion and the testimony of Dr. Jesse Davidson as to Lovell's condition and treatment in the days immediately preceding his death. By contrast, the court does not find Dr. Kelley's contrary view on causation persuasive. Despite the fact that around 750 to 1500 cc of bile was leaking from the duct each day, Dr. Kelley believed that the leak likely had no "meaningful impact on his clinical course." Trial Tr. Vol. 2, 180:7-8. However, Dr. Kelley recognized that "in some patients [bile leakage] causes a very intense reaction." Trial Tr. Vol. 2, 182:5-6. Furthermore, Dr.

18

Kelley could not articulate why Dr. Davidson's view that Lovell's sepsis resulted from the bile leak was wrong, and, indeed, stated that he did not rely on the CRMH physicians' diagnosis in forming his own opinion:

> Q    And have you seen in the procedure notes the references by the treating physicians where they say this bile leak is the explanation? They say it certainly explains his ongoing SIRS/O2 requirements. Have you seen that?
> A    Yeah. And that -- they may be right, but I don't know that that's the case.
> Q    And I take it, then, that you don't really have any reason to dispute that they're right?
> A    I mean a negative opinion on that is kind of, I mean, proving the absence of something.
> Q    So is that you don't really have a reason to prove that they're wrong?
> A    No. Nor do I have any way to prove that they're right.
> Q    Okay. It sounds like that was not something that you really considered in forming your opinion, what the Roanoke Memorial Hospital physicians were diagnosing as to that?
> A    Right.

Trial Tr. Vol. 2, 190:18–91:10.

36.    Considering the totality of the evidence presented at trial, the transection of Lovell's common bile duct more likely than not proximately caused the major bile leakage which resulted in sepsis and Lovell's demise. Although it is not entirely clear whether Lovell would have died had his small bowel not been perforated, it is clear to the court that the injury to Lovell's common bile duct caused his untimely death. This is all that Virginia law requires to sustain a finding of proximate cause. See Murray v. United States, 215 F.3d 460, 465 (4th Cir. 2000) (holding that "the causation element of medical malpractice cases ... require[s] a plaintiff to prove that it is more likely than not that the decedent would have survived in the absence of the defendant's negligence").

19

## Damages

At trial, plaintiff put on evidence of damages under Virginia Code § 8.01-52, which lists factors for a court to consider in deciding wrongful death damages.

37. The United States stipulated that if the court finds that Drs. Choudhury and Butler breached the standard of care, plaintiff is entitled to special damages the amount of $293,423.78. This figure accounts for medical and funeral expenses incurred by defendants. Medical expenses totaled $286,625.78 and funeral expenses totaled $6,798.00.

38. William James Lovell, Jr. and David Madison Lovell, both sons of William James Lovell, testified about the relationship with their father and their struggles since his passing. Both sons indicated that prior to his death, they maintained a strong relationship with their father. Both went on to state that their father's death has caused them considerable hardship and anguish. Plaintiff asked the court to award each of them $250,000.00 for the damages incurred by William James Lovell, Jr. and David Madison Lovell. The government put on no contrary evidence or argument as to damages. After considering the grounds for damages under Virginia Code § 8.01-52, specifically as to "[s]orrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent," the court finds that both William James Lovell, Jr. and David Madison Lovell have suffered in the amount of $250,000.00 as a result of their father's death.[4]

---

[4] Virginia Code §§ 8.01-53, 8.01-54 govern the distribution of awards in wrongful death suits. At trial, plaintiff's counsel represented that David Madison Lovell and William James Lovell, Jr. are the only statutory beneficiaries under Virginia Code § 8.01-53 (directing wrongful death damages awards be distributed to "the surviving spouse, children of the deceased and children of any deceased child of the deceased," if any). Virginia Code § 8.01-54 requires the damages awarded in this case to be paid to Wertman, as Lovell's personal representative. Va. Code Ann. § 8.01-54(C). Wertman will use the award to first pay the costs and reasonable attorney's fees associated with this lawsuit, then pay funeral and medical costs, and lastly distribute equal sums of the remainder to Lovell's two sons. Id.

20

39. Accordingly, the court finds that pursuant to Virginia Code § 8.01-52, plaintiff is entitled to $793,423.78 in damages.

## CONCLUSIONS OF LAW

Wertman, Lovell's longtime partner, qualified as administrator of his estate on April 5, 2012. Wertman and Lovell resided in Wythe County, Virginia. Wertman pursued a claim with the Department of Veterans Affairs (VA) within two years of the accrual of the claim. The VA denied her claim and, on January 29, 2015, Wertman requested the department to reconsider the denial. The VA failed to provide a final denial of appeal, and Wertman brought the suit at bar on August 27, 2015.

The federal government is immune from suit unless it consents to be sued. United States v. Sherwood, 312 U.S. 584, 586 (1941). The Federal Torts Claim Act ("FTCA") creates a waiver of liability in civil actions resulting in wrongful death caused by a government employee while such employee is acting within the scope of his employment. 28 U.S.C. § 1346(b)(1). Before pursuing a claim under the FTCA in federal court, a plaintiff must have timely filed a claim with the appropriate agency within two years of the accrual of the cause of action and the reviewing agency must have issued a final denial. 28 U.S.C. § 2401(b). Failure by the reviewing agency to make a final decision within six months after the filing of the claim is deemed a final denial for purposes of 28 U.S.C. § 2401(b). 28 U.S.C. § 2675(a). Because Dr. Choudhury performed and supervised the procedure at issue during the course of his employment with the United States at the Salem VA hospital and Wertman properly pursued an administrative remedy before filing this action in federal court, this court maintains jurisdiction over this action.

21

In an FTCA suit alleging medical malpractice in Virginia, Virginia law governs the underlying cause of action. Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991). To prevail in a medical malpractice action, Virginia law requires a plaintiff to establish (1) the applicable standard of care, (2) breach of that standard of care, and (3) that such breach caused injury or death. Bitar v. Rahman, 272 Va. 130, 136-37, 630 S.E.2d 319, 323 (2006). Expert testimony is generally needed to establish the applicable standard of care, that the standard was breached, and that the breach caused the claimed damages. Bitar, 272 Va. at 138, 630 S.E.2d at 323 (citing Perdieu v. Blackstone Family Practice Ctr., Inc., 264 Va. 408, 420, 568 S.E.2d 703, 710 (2002)). Courts may only consider expert testimony that is rendered to a reasonable degree of medical probability. Id. Damages in wrongful death cases are governed by Virginia Code § 8.01-52.

Plaintiff has met her burden in establishing the applicable standard of care and that the Salem VA surgeons breached that standard. Dr. Chevinsky testified that the standard of care required the Salem VA surgeons to perform a cholangiogram or otherwise identify nearby critical structures before cutting Lovell's gallbladder during the cholecystectomy. In fact, defendant's own expert, Dr. Kelley, testified that the standard of care required the Salem VA surgeons to at least consider a cholangiogram. In concluding that plaintiff met her burden on the issue of standard of care and breach, the court accords significant weight to Dr. Kelley's testimony that cutting "too far down" during a subtotal cholecystectomy and transecting the bile duct would breach the standard of care. While the condition of Lovell's gallbladder made the surgery a difficult one, Wertman proved that Drs. Choudhury and Butler did exactly what Dr. Kelley said they ought not do—sever the common bile duct

while performing Lovell's subtotal cholecystectomy. Accordingly, the court finds that plaintiff has proved by a preponderance of evidence the standard of care and breach elements of medical malpractice.

Plaintiff has also met her burden in establishing that the Salem VA surgeons' breach of the applicable standard of care was a proximate cause of Lovell's death from sepsis. To establish causation, a plaintiff must show "it is more likely than not that the decedent would have survived in the absence of defendant's negligence." Murray, 215 F.3d at 463. The evidence established two contributing factors towards Lovell's death: the bile duct injury and the perforation of the small bowel. Indeed, along with multiple-organ failure, Dr. Davidson noted these two injuries as the cause of Lovell's death in the "discharge summary" he prepared as Lovell's attending physician. Trial Tr. Vol. 2, 115:4-9. Both Drs. Chevinsky and Davidson testified that the small bowel perforation alone would likely not have resulted in Lovell's death. Rather, the cutting of the common bile duct was a proximate cause of Lovell's death. Trial Tr. Vol. 1, 105:2-12 (Dr. Chevinsky); Trial Tr. Vol. 2, 115:15–16:1 (Dr. Davidson). The court concludes, consistent with this testimony, that Lovell likely would have survived had his common bile duct not been severed during the subtotal cholecystectomy. Accordingly, the court finds that plaintiff has proved by a preponderance of evidence the causation element of medical malpractice.

Plaintiff claimed that as a result of defendant's negligence, she is entitled to recover medical and funeral costs totaling $293,423.78 and other compensatory damages in the amount of $500,000 under Virginia Code § 8.01-52. The government presented no evidence to challenge the claimed damages.

Case 7:15-cv-00466-MFU-RSB   Document 76   Filed 01/24/17   Page 23 of 24   Pageid#: 1764

In sum, the court finds that plaintiff has met her burden in establishing the elements of medical malpractice by a preponderance of the evidence and, accordingly, finds in favor of the plaintiff.

The court **GRANTS** judgment for the plaintiff in the amount of $793,423.78. An appropriate Order will be entered.

Entered: 01 – 23 – 2017

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge